IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHARLES R. METCALF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-631-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

Claimant, Charles R. Metcalf ("Metcalf") requests judicial review pursuant to 42 U.S.C. §

405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner")

denying Metcalf's applications for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate

Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Metcalf

appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner

erred because the ALJ incorrectly determined that Metcalf was not disabled. For the reasons

discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Metcalf was 49 at the time of the first hearing before ALJ John Volz on June 15, 2006, and

50 at the time of the second hearing on December 17, 2007. (R. 35-124, 164). Metcalf had earned

his GED certificate. (R. 120). Metcalf testified that he had been a self-employed carpenter,

mechanic, and concrete finisher. (R. 49-50, 52-54, 94, 113). Metcalf ended his last job as a theater

stage carpenter after numbness in his hands caused difficulty in grasping and holding onto items. (R. 94).  His inability to hold tools made him fearful he might cause injury to someone on the set. *Id.*

Metcalf attributed his inability to hold items to neck problems and hand numbness.  (R. 52, 94, 97, 113).  He testified he was unable to grasp objects, constantly dropped things, and could not open or lift soda bottles.  (R. 50, 96-97, 113).  He believed the combination from neck problems and symptoms from diabetes caused pain, numbness, and shaking in his hand.  (R. 59, 64, 105).  The symptoms additionally caused Metcalf occasions where his thumbs locked up.  (R. 53, 64).  Metcalf was unable to sleep due to the neck pain and hand numbness.  (R. 53, 96, 101, 106).  He had difficulty moving his neck from side to side, and he sometimes heard his neck "pop."  (R. 52, 69).  Metcalf had pain when sitting and holding his head up for long periods.  (R. 70).  He testified he experienced pain on a constant daily basis.  (R. 76, 105, 114).  Metcalf attempted to ease his pain by lying down, walking, standing in a shower, or taking medication. (R. 52, 59, 101-02).

Metcalf additionally experienced pain walking and kneeling due to knee problems.  (R. 101-02).  Osgood-Schlatter disease[1] caused him knee pain that made any movement or applied pressure painful.  *Id.*   Synovectomy[2] surgery on his left leg caused neuritis and leg muscle spasms. (R. 54, 61-62, 102).  Two to three times a month Metcalf experienced intense, radiating pain from the top

---

[1] Osgood-Schlatter disease is "[o]steochondritis of the epiphysis of the tibial tuberosity." Taber's Cyclopedic Medical Dictionary 1377 (17th ed. 1993).

[2] Synovectomy is "[e]xcision of synovial membrane."  Synovial membrane is "[m]embrane lining the capsule of a joint." Taber's Cyclopedic Medical Dictionary 1934 (17th ed. 1993).

of his left thigh to the bottom of his leg.  (R. 61-63).  Pain from burning muscle cramps left him on the floor crying.  *Id.*  He believed weather contributed to his pain.  *Id.*  Metcalf's diabetes caused him to experience pain in his knees, feet, and shoulders.  (R. 101, 113).  He said he hurt "all over" with joint pain.  (R. 63, 113).

Metcalf took pain medications, muscle relaxers, sleep medication, and diabetes medication. (R. 60-61, 64-65, 67-68).  He testified that he received medication management from Oklahoma University's Longitudinal Clinic, and from Dr. David Traub.  (R. 44-45, 60, 65-66, 70).  Side effects from the medications made Metcalf drowsy, dizzy, and moody. (R. 52, 69, 114).

Metcalf believed he experienced increased levels of aggravation and irritability due to medication side effects and experienced pains.  (R. 64-65, 67, 69, 114-16).  On occasion he had "blown up" at people.  (R. 75-76).  Fractious moods caused him problems socializing.  *Id.*  Often his wife communicated for him.  *Id.*  He often became easily agitated when driving.  (R. 103).  He believed he suffered depression due to guilt he felt from being unable to care for his family.  (R. 115-16).  He experienced weight fluctuation and eating problems.  (R. 116).

Metcalf said that he watched television and walked in the back yard on a typical day.  (R. 101, 103, 116-18).  Symptoms from chronic obstructive pulmonary disease ("COPD"), along with pain from diabetes, made walking difficult for Metcalf.  (R. 100-02).  He stated he read occasionally during the day, but had blurry vision that  made reading a book or a computer screen difficult.  (R. 103-04, 116-18).  He also testified that short and long term memory problems affected his ability to read and to learn.  (R. 44, 50, 57,  59, 79-80).  Metcalf said he had problems concentrating due to constant interruptions from his need to walk around to ease his neck pain.  (R. 118).  He tried to help

his wife with the dishes, laundry, and driving the children.  (R. 50, 103).  Limited strength caused him difficulty in carrying items over a gallon of milk or two liters of soda.  *Id.*

Metcalf reported he first sought treatment at Morton Comprehensive Health Services ("Morton") for the neck pain.  (R. 96-97, 102-03).  It was at Morton that he was diagnosed with diabetes and degenerative joint disease ("DJD") of his cervical spine, and he was treated with medications.  *Id.*   Doctors at Morton discussed the option of surgery, but they said that surgery would have a low probability of success due to the degenerative nature of his condition.  (R. 68-69, 71, 82).  Metcalf stopped treatment at Morton due to lack of funds, medication problems, and difficulty with their scheduling procedure.  (R. 102, 107).

Metcalf testified that he then started treatment for his neck at Oklahoma University's Bedlam Clinic ("Bedlam Clinic").  (R. 97).  An MRI taken at Bedlam Clinic confirmed fusion of his C7 and T1 vertebrae, along with three bulged vertebrae in his neck.  (R. 96-99, 113).

Metcalf testified that as part of his efforts to obtain Social Security disability benefits he requested Dr. David Traub at the Heritage Medical Clinic review his MRI films and medical records.  (R. 48, 95-96, 107-08, 110-13).   He testified that Dr. Traub determined he was totally disabled from Osgood-Schlatter disease, synovectomy,  neck and joint pain.  (R. 113).

Metcalf testified he saw Dr. Sutton in 2007 for evaluation.  (R. 45, 57, 73).  He said Dr. Sutton's examination was 10-15 minutes long with focus on his hands, feet and knees, but not on his neck or shoulders.  (R. 59-60, 73-75).

The administrative record shows that Metcalf was first seen at Morton on January 15, 1998 with tingling, weakness, and numbness of his third and fourth fingers of his left hand.  (R. 331-36).

The doctor's examination concluded Metcalf had carpal tunnel syndrome.  (R. 335-36).

On September 16, 2003, Metcalf presented to Morton with complaints of numbness in his left fingers and radiating right shoulder pain.  (R. 288-89).  He additionally reported chest pain that had dissipated prior to the appointment.  *Id.*  EKG test results were normal.  *Id.*  Metcalf was diagnosed with carpal tunnel syndrome in his left hand and right shoulder tendonitis.  (R. 289).

During follow-up appointments on October 6, 2003 and October 13, 2003, Metcalf reported resolution of the prior chest pain.  *Id.*  (R. 321-23).  He continued with hand numbness and bilateral shoulder pain.  (R. 285).  He was diagnosed with non-insulin dependent diabetes mellitus ("NIDDM") and bilateral shoulder tendonitis. (R. 321-23).  He was started on diabetes medications and provided refills of pain medications*.  (R. 287, 322-23).

Metcalf presented to Morton on January 6, 2004 with continued neck pain.  (R. 318-19)*. Examination showed Metcalf had full and bilaterally equal musculoskeletal strength.  (R. 319). Cervical spine x-ray revealed Metcalf had degenerative arthritis of the lower cervical spine. (R. 293, 320).  He was provided a refill of Darvocet medication for pain.  (R 319).

Michael Montague, PA, of Morton examined Metcalf on March 1, 2004 for complaints of headaches, neck, and upper arm pain.  (R. 317).  Metcalf showed mild-to-moderate tenderness with palpation over the cervical spine, along with mild tenderness to right and left shoulder with abduction of shoulders.  *Id.*  Metcalf advised that previously prescribed medication worked to alleviate the pain, but he had limited his use of the medication as a precaution against potential kidney problems.  *Id*.  He was advised to use his medications as previously prescribed and Depo-Medrol was added.  *Id.*  Mr. Montague discussed sending Metcalf to a rehabilitation specialist if

5

there was no improvement in his pain.  *Id*.

Metcalf saw Mr. Montague at Morton on July 14, 2004 with complaints of bilateral shoulder pain and a high degree of pain in the back of his neck.  (R. 315-16).  Examination showed mild-to-moderate tenderness with palpation over cervical spine.  *Id*.  No reduction of his musculoskeletal strength was observed.  *Id*.  He had a continued diagnosis of DJD of the cervical spine.  *Id*.  Metcalf's pain medications were continued.  *Id*.  Progress notes prepared September 15, 2004, by Mr. Montague reflect that Metcalf was to be referred to rehabilitation / pain management for complete evaluation of musculoskeletal function.  (R. 275).  Mr. Montague saw Metcalf on November 15, 2004 for medication refills.  (R. 272-74).  Examination of Metcalf's cervical spine revealed mild-to-moderate tenderness to palpation.  (R. 272).  He demonstrated full head and neck motion, and full bilateral musculoskeletal strength.  *Id*.  Mr. Montague continued to assess Metcalf with DJD of cervical spine, and NIDDM.  *Id*.  He provided Metcalf with refills of pain medications. *Id*.

Metcalf apparently saw Dr. Vincent Bryan at Springer Clinic as a new patient on October 4, 2004.  (R. 268-71).  On a checklist on which the examiner is to circle abnormal items, it appeared that Dr. Bryan circled several items for musculoskeletal and neurological categories, including gait, muscle strength, range of motion, and sensation.  (R. 270).  While the hand-written assessments are not completely legible, they appear to be osteoarthritis, tension headache, muscle strain, diabetes, degenerative disc disease, COPD, radicular neuropathy, chronic low back pain, and hypoglycemia.  (R. 271).   Metcalf phoned Dr. Bryan on January 28, 2005 with increased neck pain.  (R. 298).  Metcalf reported the pain was severe and radiated from his neck into his head.  Dr. Bryan refilled

Metcalf's prescriptions for Lortab and Lodine medications.  *Id.*  The medications were refilled again on April 14, 2005, and June 14, 2005.  (R. 297-98).

Complaints of neck pain and a cough brought Metcalf into the Bedlam Clinic on February 23, 2006.  (R. 342).  He reported continued use of Lortab pain medication.  *Id.*  On Metcalf's return visit to the Bedlam Clinic on March 7, 2006 he complained of left hand weakness and neck pain.  (R. 341).  He reported occasions when he dropped items and when he was unable to sleep due to neck pain.  *Id.*  Examination revealed he had weak left hand grip and wrist.  *Id.*  Dr. Witt ordered a cervical spine MRI and lab work.  (R. 341, 347-50).  He provided Metcalf with prescriptions for Naproxen, Methocarbamol, and  massage.  (R. 341).  Results from the March 22, 2006 MRI showed Metcalf with mild midline annular bulges without disc herniation and congenital fusion of C7 and T1.  (R. 350).

Metcalf reported stability and manageability of his symptoms at his April 3, 2006 follow-up appointment at the Bedlam Clinic.  (R. 340).   He experienced a pulling sensation in his left shoulder. *Id.* In addition to Metcalf's use of Lortab, he was prescribed Naproxen for DJD, along with Methocarbamol and Metformin for his diabetes.  *Id.*  His chest pain was assessed as "noncardiac."  *Id.*

During a April 24, 2006 appointment at the Bedlam Clinic, Metcalf complained of insomnia, and he was provided a prescription.  (R. 339).  At a  return appointment of June 26, 2006, Metcalf reported that the insomnia had continued and that he also had stiffness in his neck.  (R. 338). Appointment notes indicate Metcalf requested a refill for Lortab.  *Id.*  The physician's assistant prescribed Trazadone for Metcalf's insomnia.  *Id.*  At a follow-up appointment on August 4, 2006, Metcalf reported the Trazadone had helped improve his sleep.  (R. 359).

2094b8643a019d01

Metcalf presented to the Bedlam Clinic next on August 21, 2006 for follow-up related to pneumonia and dermatitis. (R. 354-58). He advised that he had recently been hospitalized for pneumonia and a medication reaction. (R. 354). He stated hospital doctors had informed him he might have a thyroid condition. *Id.* Blood work-up and chest x-rays were ordered to check his diabetic symptoms and his thyroid. *Id.* At a follow-up appointment on September 6, 2006, Metcalf complained of muscle spasms, chronic pain in his left upper arm, and symptoms of fatigue. (R. 352-53). His diabetes was noted to be uncontrolled. *Id.*

An agency nonexamining consultant completed a Physical Residual Functional Capacity Assessment on November 2, 2004. (R. 303-09). The consultant determined that Metcalf could occasionally lift 50 pounds and frequently carry 25 pounds. (R. 304). He could stand, walk, and sit for about 6 hours in an 8-hour workday. *Id.* He had no limits in his ability to use hand and/or foot controls and to push or pull. *Id.* No postural, manipulative, visual, communicative, or environmental limitations were established. (R. 305-09).

Metcalf was seen March 22, 2006 by David A. Traub, M.D. at Heritage Medical Clinic. (R. 312-13). Dr. Traub stated that Metcalf reported that his appointment need was a cumulative review of his medical records, medical history, and physical examination in order to formulate recommendations as to his treatment and his ability to work. (R. 312). Metcalf informed Dr. Traub that pain in his neck, shoulder, and left leg caused him to quit his job two years earlier. *Id.* Metcalf reported that his neck pain started with a gradual onset in approximately 2004. (R. 312). He stated that he had burning, aching, radiating neck pain from his shoulders and into his shoulder joints. *Id.* He further stated that the pain caused him constant left sided occipital head pain. *Id.* Metcalf believed that his neck pain

contributed to bilateral, intermittent numbness and tingling sensation in his hands. *Id.* Metcalf reported that he had bilateral knee pain that had started two years earlier. *Id*.

Dr. Traub's physical examination determined Metcalf had pain with palpation of his neck, and decreased range of motion in his neck. (R. 311-12). He found Metcalf had myofascial trigger points in the paraspinous muscles of his neck, the occipital scalp, and the suprascapular areas. *Id*. Dr. Traub summarized the results of the MRI of Metcalf's cervical spine. *Id*. Dr. Traub found crepitus in both knees, and he believed a large tibial tuberosity was likely Osgood-Schlatter disease. (R. 312).

Dr. Traub listed six assessments, including osteoarthritis of Metcalf's neck, both shoulders, and both knees. (R. 313). He listed details of each of these joints, including notes of pain and reduced range of motion. *Id*. He suspected a rotator cuff tear in Metcalf's left shoulder, and likely "torn meniscus or torn patella cartilage" in Metcalf's right knee. *Id*. He also noted "[r]eflex sympathetic dystrophy" of Metcalf's left leg. *Id*. Dr. Traub concluded that Metcalf's impairments left him "totally disabled and not capable of work of any kind." *Id.*

On August 31, 2007, agency consultant, Joseph Sutton, II, D.O., examined Metcalf. (R. 361-77). During the examination Metcalf explained that the physical nature of his work caused arthritis in his neck and left him with neck pain and headaches. (R. 361-62, 365). Metcalf felt the physical work caused him to suffer pain in his knees and shoulders. (R. 361). Metcalf stated pain and neuropathy of his hands caused him to drop objects, and to experience nighttime hand numbness. (R. 361-64). Metcalf believed the synovectomy caused him decreased sensation of his feet. (R. 361, 363-64). Metcalf stated that his diabetes and hypertension caused him poor and blurry vision. (R. 361-62). Metcalf reported he had a low tolerance for vibration and noises due to having used jack hammers when

he had worked.  (R. 365).  He advised Dr. Sutton he was unable to raise his arms over his head while standing or moving his shoulders.  (R. 363-64).

Dr. Sutton assessed Metcalf with shoulder arthritis, although he said he found a "discrepancy" during the examination because he observed Metcalf freely raised his arms over his head while lying on the exam table.  *Id.*  Dr. Sutton concluded Metcalf had degenerative joint disease in the neck, with complaints of all over pain, diabetes,  neuropathy "which patient says is due to diabetes," and controlled hypertension.  (R. 364).  Dr. Sutton then provided a narrative summary of his functional assessment, although he also attached a Medical Source Statement.  (R. 364, 370-75).

The Medical Source Statement indicated Metcalf could frequently lift and/or carry up to 10 pounds and occasionally up to 50 pounds.  (R. 370).   Dr. Sutton indicated Metcalf could sit, stand, and walk for 2 hours at one time, and for a total of 6 hours for each activity in an 8-hour work day.  (R. 371).  Metcalf could occasionally reach and could continuously handle, finger, or push/pull.  (R. 372). He could occasionally climb, balance, stoop, kneel, crouch, and crawl.  (R. 373).  Dr. Sutton's routine eye chart exam diagnosed Metcalf with 20/70 vision in both eyes, and he questioned  if Metcalf's eyesight would improve with lenses.  (R. 364, 374).  Dr. Sutton checked a box indicating Metcalf would not have ability to avoid ordinary hazards in the workplace, but the narrative summary in his report indicated that Metcalf had that ability.  *Id.*  Dr. Sutton found no environmental limitations.  (R. 374). Dr. Metcalf additionally executed an SSA form titled Range of Joint Motion Evaluation Chart.  (R. 366-69).  His evaluations of Metcalf's joint motion found limitation at 80 degrees in Metcalf's ability to bend forward at the hips.  (R. 363, 367).  Dr. Sutton opined the deficit was due to obesity rather than any physical finding. (R.  363).  His exam found Metcalf had decreased left to right neck rotation.  *Id.*

**Procedural History**

In 2004, Metcalf applied for DIB and for SSI.  (R. 164-67, 378-81).  These claims were denied initially on November 5, 2004, and upon reconsideration on June 15, 2005.  (R. 139-42, 144-46).  A hearing was held before ALJ John Volz on June 15, 2006.  (R. 87-124).  Metcalf received an unfavorable decision dated August 23, 2006.  (R. 127-35).

Metcalf appealed the unfavorable decision, and on April 27, 2007 the Appeals Council issued a Remand Order directing the ALJ to evaluation Metcalf's self-employment income, give further consideration to examining source opinions, obtain additional evidence concerning Metcalf's impairments, further evaluate Metcalf's subjective complaints, and give further consideration to Metcalf's RFC.  (R. 160-62).  A second hearing was held December 17, 2007.  (R. 35-86).  At the commencement of the hearing, Metcalf amended the alleged date of onset of his disability from October 1, 2003 to January 1, 2006.  (R. 38).  In a decision dated  January 8, 2008, the ALJ concluded Metcalf had not been under a disability at any time through the date of the decision.  (R. 17-25).  On July 31, 2009, the Appeal's Council denied review of the ALJ's findings.  (R. 6-8).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal.  20 C.F.R. § 404.981, § 416.1481.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful

work in the national economy." 42 U.S.C. § 423(d)(2)(A).  Social Security regulations implement a

five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[3]  *See also Williams*

*v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any

of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."

*Id.*

　　　Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).

This Court's review is limited to two inquiries: first, whether the decision was supported by substantial

evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d

1208, 1214 (10th Cir. 2004) (quotation omitted).

　　　Substantial evidence is such evidence as a reasonable mind might accept as adequate to support

a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will

---

[3]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

12

"meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of Administrative Law Judge

The ALJ found that Metcalf met insured status requirements through December 31, 2010.  (R. 19).  At Step One, the ALJ found that Metcalf had not engaged in any substantial gainful activity since his alleged onset date of January 1, 2006.  *Id.*  At Step Two, the ALJ found that Metcalf had  severe impairments of "diabetes mellitus, and disorders of the back, discogenic and degenerative."  (R. 20).  At Step Three, the ALJ found that Metcalf's impairments did not meet a Listing.  *Id.*

The ALJ determined that Metcalf had the RFC to do medium work with restrictions of no overhead pulling and the ability to only reach in front of him.  *Id.*  At Step Four, the ALJ found that Metcalf was unable to perform his past relevant work.  (R. 24).  At Step Five, the ALJ found that there were jobs that Metcalf could perform, taking into account his age, education, work experience, and RFC.  (R. 24-25).  Therefore, the ALJ found that Metcalf was not disabled from January 1, 2006 through the date of his decision.  (R. 25)*.*

### Review

Metcalf's first argument is that the ALJ's RFC determination, and therefore his hypothetical to the vocational expert at Step Five, failed to include the opinion evidence of Dr. Sutton that Metcalf had a reaching limitation and that he did not have the ability to avoid work hazards due to

13

his vision.   His second complaint is that the ALJ did not properly evaluate the opinion evidence of

Dr. Traub, and his third complaint is that the ALJ's credibility assessment was flawed.   The

undersigned finds that substantial evidence supports the ALJ's decision, and the decision complies

with legal requirements.   Therefore, the ALJ's decision is affirmed.

<u>Dr. Sutton's Opinion Evidence</u>

Metcalf characterizes his assertion that the ALJ did not properly account for the opinion

evidence of Dr. Sutton as a failure of the hypothetical question to the vocational expert at Step Five to

be precise.   Metcalf asserts that the ALJ's RFC determination, and the hypothetical, should have

included the limitations that were indicated in the Medical Source Statement that Dr. Sutton completed,

related to reaching and to Metcalf's inability to avoid work hazards.[4]

First, the ALJ was entitled to look at the entire report of Dr. Sutton, which included his narrative

report in addition to the Medical Source Statement, which was a form on which various functional

capacity judgments were made by checking boxes.  (R. 361-77).   In this case, Dr. Sutton prepared a

narrative report of the examination of Metcalf, and he noted in the narrative section that when Metcalf

was standing during the examination, he had reported that he could not raise his arms over his head to

do that portion of the exam.  (R. 363).   Yet, when Metcalf was lying flat on the examination table, he

---

[4]In his Reply Brief, Metcalf for the first time argues that the numbers of jobs should have been reduced and that the ALJ did not ask the VE if her testimony deviated from the Dictionary of Occupational Titles.  Raised for the first time in the Reply Brief and with one-sentence arguments, these issues are not developed ones that this Court can review in a meaningful way. *See Wall v. Astrue*, 361 F.3d 1048, 1066 (10th Cir. 2009) (perfunctory presentation of argument by claimant deprived the district court of the opportunity to analyze and rule on issue); *Zumwalt v. Astrue*, 220 Fed. Appx. 700, 776-77 (10th Cir. 2007) (unpublished) (waiver rules apply in Social Security disability context when issues are not sufficiently preserved).

had both arms over his head, and Dr. Sutton was "easily" able to move his arms in a passive fashion. *Id.* When Dr. Sutton completed the checklist form, he checked boxes stating that Metcalf could only occasionally reach overhead and only occasionally do all other reaching.  (R. 372).

The ALJ explicitly referred to Metcalf's ability to reach in his RFC determination, stating that Metcalf had a restriction of no overhead pulling and to reaching only with his arms in front of him.  (R. 20).   In the narrative part of his report explaining the medical evidence supporting his RFC determination, the ALJ directly discussed this portion of Dr. Sutton's report:

> [Dr. Sutton] gave a restriction of lifting overhead based on the claimant's complaints. There was discrepancy in the claimant's allegations and examination.  The claimant stated that he could not raise his hands over his head.  However, while the claimant was lying on the examination table, he actually had both of his arms over his head and [Dr. Sutton] easily was able to put his arms over his shoulders in a passive fashion.

(R. 23).

The ALJ also reviewed all of the other medical evidence, including the Physical Residual Functional Capacity Assessment completed in 2004 that found no restrictions on Metcalf's ability to reach.  (R. 20-24, 303-09).  Thus, while it would have been preferable for the ALJ in his discussion, quoted above, to explicitly state that he was rejecting the checked boxes of Dr. Sutton relating to only occasional reaching in all directions in favor of his stated RFC, the discussion of the medical evidence makes clear that the ALJ considered all of the medical evidence, and it gives reasons why the ALJ rejected the checked boxes.  *Cobb v. Astrue*, 364 Fed. Appx. 445,  450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were "clear enough" and did not violate rule against *post hoc* justification).  The ALJ's discussion of the "discrepancy" Dr. Sutton described during his physical

15

examination of Metcalf fulfilled the ALJ's obligation to give specific, legitimate reasons for rejecting a portion of the opinion of a consulting examiner.  *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003).

Metcalf also complains that the ALJ did not take into account his inability to avoid workplace hazards due to his vision, which was a limitation again indicated by Dr. Sutton by checking a box on the Medical Source Statement.  (R. 373).  This was clearly a case of mistakenly checking the wrong box, however, because in his narrative report, Dr. Sutton noted Metcalf's 20/70 vision, but then stated "[h]e would not have any problem avoiding hazards."  (R. 364).  Under these circumstances, the undersigned finds that it was not error for the ALJ to omit a discussion of the checked box relating to Metcalf's ability to avoid hazards.[5]  *See Hackett v. Barnhart,* 395 F.3d 1168, 1174 (10th Cir. 2005) (affirming ALJ's rejection of some checked boxes of treating physician when they conflicted with the physician's narrative report); *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (checklist evaluation

---

[5]Metcalf in his reply brief argues that excusing the ALJ's omission of discussion of the checked box is an impermissible *post hoc* justification, but the undersigned disagrees.  In *Big Pond v. Astrue*, 280 Fed. Appx. 716, 719 n.2 (10th Cir. 2008) (unpublished), the Tenth Circuit rejected an argument that the Commissioner engaged in *post hoc* justification of the ALJ's decision when the issue raised by the claimant was that the ALJ had failed to discuss her cardiac problems:

> We have simply reviewed the record in order to determine whether, and then to illustrate why, the ALJ's omissions were not legal error.  The ALJ was not required to provide grounds in the decision for failing to do what was not required.  Thus, neither we nor the Commissioner have relied on a substitute rationale for upholding the ALJ's decision.

*Id.*  Here, the undersigned finds that the ALJ was not required to specifically discuss the obvious error of Dr. Sutton in checking the box indicating that Metcalf could not avoid workplace hazards, and therefore the Court is not engaged in impermissible *post hoc* justifications.

form, standing alone, unaccompanied by thorough written report, is not substantial evidence).

Dr. Traub's Opinion Evidence

Metcalf also complains that the ALJ did not properly weigh Dr. Traub's report.  It is unclear from Metcalf's brief whether he is conceding that Dr. Traub was not a treating physician whose opinion would be entitled to deference.  Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2).  Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

Substantial evidence supports the conclusion that Dr. Traub was an examining consultant physician, rather than a treating physician, and therefore the ALJ did not have to comply with the requirements stated above.  The only evidence in the record is a two-page report from Dr. Traub giving a summary of a one-time physical examination.  (R. 312-13).  Therefore, if Dr. Traub had given opinion evidence relating to Metcalf's functional capacity, the requirement would have been that the ALJ must consider the opinion evidence and must provide specific legitimate reasons for rejecting it. *Doyal,* 331 F.3d at 763-64.

The threshold inquiry, however, is whether Dr. Traub gave any true opinion evidence as

contemplated by Social Security regulations, and the undersigned finds that he did not.  The Tenth

Circuit in  *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical

opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's]

physical limitations, or any information about what activities [the claimant] could still perform."  Thus,

the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may

never return to work" was not a true medical opinion.  *Id.  See also Martinez v. Astrue,* 316 Fed. Appx.

819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons

for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v.*

*Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation

that the claimant see an orthopedic specialist was not a treating physician opinion because it did not

address functional limitations).

       Here, Dr. Traub's opinion was summary:

> It is my opinion that this gentleman is totally disabled and not capable of work of any
> kind due to the aforementioned medical conditions.  I recommended to him today to
> proceed with his application for Social Security Disability as I doubt he will be able to
> find employment that he will be physically capable of doing.

(R. 313).  Because it did not give Dr. Traub's opinion regarding specific physical limitations, or

regarding what activities Metcalf could still perform, it was not true opinion evidence.  *Cowan,* 552

F.3d at 1189.  Because of the nature of the summary opinion given by Dr. Traub, the ALJ was not

obligated to provide specific legitimate reasons for rejecting that opinion.[6]

----

       [6]Metcalf again argues that this is an impermissible *post hoc* justification, but the
undersigned disagrees because the ALJ noted the nature of the opinion evidence of Dr. Traub.
The ALJ specifically said that Dr. Traub's physical examination did not result in a functional
residual capacity assessment.  (R. 23).  The undersigned agrees with Metcalf that the ALJ's

Credibility Assessment

Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].  Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

The ALJ's credibility statement came toward the end of his report, and he stated that he found Metcalf "to be less than credible in his testimony and demeanor at the hearing.  [Metcalf] was not forthcoming in this statements and contradicted himself."  (R. 23).  The ALJ found that Metcalf "feigned memory problems but would then have clear recollection of events" in order to contradict other evidence.  (R. 23-24).  The ALJ said that two specific examples of this were his testimony on the consulting examination with Dr. Sutton, and his testimony regarding his self employment.  (R. 24).  Earlier in the ALJ's decision, he had described Metcalf's testimony regarding his income from self-employment.  (R. 19).  He characterized Metcalf's testimony on this point as "evasive."  *Id.*  Later in the decision, after describing Dr. Sutton's opinion evidence, the ALJ summarized Metcalf's testimony

---

discussion that Dr. Traub might have given his opinion out of sympathy for Metcalf was not a legitimate reason for rejecting that opinion, but the ALJ's rejection is still sustained given the nature of Dr. Traub's summary opinion.  *See, e.g., Tom v. Barnhart*, 147 Fed. Appx. 791, 793 (10th Cir. 2005) (unpublished) (ALJ's improper questioning of physician's impartiality was not fatal to his discounting of the physician's opinion given that he articulated other legitimate reasons for discounting the opinion).

regarding the consultative examination.  (R. 23).  The ALJ stated that Metcalf first stated that he could

not recall anything about it due to memory problems, then said that he did remember the visit, and then

said that he didn't remember anything about the visit.  (R. 23, 49, 57-60, 74-75).  Additionally, while

the ALJ did not specifically refer to it again in his discussion of Metcalf's credibility, the ALJ's

previous discussion of the discrepancy of Metcalf's movement of his arms during the examination of

Dr. Sutton also is substantial evidence that supports his credibility determination.  *Cobb,* 364 Fed.

Appx. at  450 (unpublished) (while ALJ's credibility assessment was summary, taking the decision as

a whole the ALJ's findings regarding the claimant's testimony were "clear enough" and did not violate

rule against *post hoc* justification).  The ALJ's credibility determination was supported by specific

reasons linked to substantial evidence, and the undersigned therefore finds that it should be affirmed.

*Mann*, 284 Fed. Appx. at 571 (unpublished) (finding credibility determination adequate when ALJ

discussed three points); *Rhodes v. Barnhart*, 117 Fed. Appx. 622, 629 (10th Cir. 2004) (unpublished)

(even though ALJ's language came close to improper boilerplate, credibility determination was

affirmed when the ALJ's "basic thrust" was supported by substantial evidence).

    Metcalf argues that the ALJ's credibility assessment is not adequate because it did not comply

with the previous remand order of the Appeals Council, specifically by not reviewing Metcalf's

activities of daily living.  This Court's standard of review, however, is not whether the ALJ complied

with a previous order of the Appeals Council, but rather whether substantial evidence supports the

ALJ's decision.  *See Miller v. Barnhart*, 175 Fed. Appx. 952, 956 (10th Cir. 2006) (unpublished).

Metcalf also argues that the testimony that the ALJ cited should not have been viewed as having a

negative effect on Metcalf's credibility.  Further, Metcalf argues that factors such as his work record,

demeanor, and objective medical evidence enhance his credibility.  Metcalf's arguments regarding

credibility constitute "an invitation to this court to engage in an impermissible reweighing of the

evidence and to substitute our judgment for that of the Commissioner," and the undersigned declines

that invitation.  *Hackett*, 395 F.3d at 1173.   All of the arguments made by Metcalf essentially are that

Metcalf would like for this Court to give more weight to the evidence that is in his favor and less weight

to the evidence that disfavors his claim of disability.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

### Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal

standards were applied.  The decision is **AFFIRMED**.

Dated this 4th day of January, 2011.

Paul J. Cleary
United States Magistrate Judge